UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 19-10459-RWZ |
| | ) | |
| JOSE VASQUEZ [42], | ) | |
|          Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Jose Vasquez respectfully submits this memorandum in advance of the sentencing hearing scheduled for July 19, 2022, at 11:00 a.m..

Mr. Vasquez, now 27, has pleaded guilty to Count 1 of the Indictment charging him with RICO conspiracy. He was a member of the Latin Kings ("ALKQN") gang and, for a period of several months, elevated to the role of the "enforcer" for the New Bedford cell, before being himself violently terminated, ejected from the gang for the infraction of carrying on an affair with the girlfriend of another member.

According to the Presentence Report, Mr. Vasquez faces a guideline range of 130 to 162 months (based on OL 27, CHC VI). Mr. Vasquez objects to this guideline range and submits that the guidelines, properly calculated, yield a sentencing range of 100 to 125 months (based on OL 24, CHC VI). Mr. Vasquez also argues below that his Criminal History is overstated; departing two levels to CHC IV yields a guideline range of 77 to 96 months, providing a more useful touchstone in fashioning the ultimate sentence. (There is no plea agreement.)

Regardless of the guidelines calculation, Mr. Vasquez requests the court consider imposing a sentence of **78 months (6 1/2 years)**, as such a sentence is more consistent than the guideline range with other sentences already imposed in this case, and otherwise consistent with

the ends of justice, taking into account Mr. Vasquez's personal history and relative youth during his commision of the offense, as well as the impressive amenability to rehabilitation he has demonstrated during the pendency of his case, during which, among other achievements, **he has earned his High School Equivalency Certificate**.

## Legal Framework

The sentencing statute—18 U.S.C. § 3353—provides that the Court:

> shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2), and ... in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(1), (a)(2).

After *Booker*, the Court is required to consult, but not required to follow, the recommendations of the Sentencing Guidelines. The Court "shall consider":

> (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for— (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... issued by the Sentencing Commission …

18 U.S.C. § 3353(a)(3), (a)(4).

The Court is also required to consider:

> (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct...

18 U.S.C. § 3553(a)(7).

## Argument

1. **The History and Characteristics of the Defendant [3553(a)(1)]**

Mr. Vasquez's personal story will not sound unfamiliar to the Court. Mr. Vasquez was born to a single mother, who went on to have seven children. His biological father was absent. He did not succeed in school, was diagnosed with ADHD, and went through a succession of placements before dropping out in the ninth grade. He himself became a father at the age of 16, and was determined to be present for and to provide for his children in a way his own father did not. However, he became a juvenile delinquent, breaking into cars, before graduating to drug dealing and gun possession. His most serious case, a gun and drug case, resulted in a two-year sentence in the Hampden County House of Correction, during which he was recruited and became a member of the Latin Kings.

For Mr. Vasquez, who feelingly describes the experience in his personal statement ("Exh. A"), membership in the Latin Kings, something which had been modeled for him since he was a youngster and to which he had sometimes aspired, meant money and a place to stay, and also provided security, family and a sense of empowerment and purpose. He learned the rules laid out in the ALKQN Manifesto backward and forward, adopted the gang name Fearless, and got Latin Kings tattoos.

His career with the Latin Kings was intense, and brief. Mr. Vasquez was recruited into the gang, in part to protect himself while serving a jail sentence, in or around 2016, while serving the two year sentence imposed following his conviction for drug distribution and gun possession. PSR ¶ 134. Upon his release in early 2017, he was sent to New Bedford, where, at the age of 21, he became a street-level Latin Kings member, during which time he sold drugs from the trap

3

houses, PSR ¶¶ 135, 136, and participated in the attack on Victims 2 and 3, kicking the door of their car, and sustaining a conviction for malicious damage to a motor vehicle and a six month prison sentence. PSR ¶ 137. After his release from jail in early 2019, he was elevated, by CW-9, to the position of enforcer for the New Bedford cell. He held the position until his violent termination from the gang on October 15, 2019.

At the time of his arrest in December, Mr. Vasquez was living with an aunt in Springfield, still recovering from the beating he'd received in October. He was charting out his next steps, post-Latin Kings, and spending as much time as he could with his two children. PSR ¶ 167.

Over the past two years, Mr. Vasquez has found the focus that eluded him as a younger person. He has thrown himself into the training programs and educational programming that the Norfolk County Correctional Facility makes available. Most impressive by far is his buckling down at obtaining his G.E.D., an achievement of which he is justifiably proud. As his letter and comments to Probation demonstrate, he is a thoughtful and introspective person. He is artistic and spends time drawing. He hopes to channel these talents into a tattoos business. Exh A. PSR ¶ 183.

### 2. The nature and circumstances of the offense [3553(a)(1)]; The need for the sentence imposed – to reflect the seriousness of the offense [3553(2)(A)]

The government describes Mr. Vasquez as a high-level functionary in the Latin Kings organization, someone whose relatively high guidelines offense level is driven and justified by his active involvement in gang violence and his leadership role.

While the ALKQN tattoos on his face and body attest to Mr. Vasquez's enthusiastic

embrace of the Latin Kings gang and its philosophy, and while he does not deny that he was named the "enforcer" for the cell, there is in truth little that separates Mr. Vasquez from other street-level members of the ALKQN in New Bedford.

As discussed above, Mr. Vasquez was recruited into the gang at the approximate age of 20, while serving a two-year prison sentence in Western Massachusetts. He subsequently relocated to New Bedford at CW-9's direction. He was appointed New Bedford "enforcer" by CW-9 at age 23, and held that position for approximately 9 months in 2019, before he himself was violently expelled from the gang.

Indeed, the amount of evidence amassed and marshaled against Mr. Vasquez is a function of the fact that he was the protege of CW-9, the government's main cooperating witness. CW-9 captured hours of body cam footage involving Mr. Vasquez, including and up to his last moments in the gang. It is less then an indication that Mr. Vasquez was more active than the Incas, caciques or other enforcers in this case who have received lesser sentences than that proposed here, but rather an arbitrary accident of the investigation.

Mr. Vasquez's termination from the gang for an infraction that would have been forgiven or quietly ignored if committed by a member who had true status and power presents the most dramatic evidence that Mr. Vasquez's leadership position was more nominal than real.

CW-9 described the incident to agents in October, 2019, noting that Jorge Rodriguez ("G," sentenced to 218 months) "ordered" Mr. Vasquez's termination, that Mr. Vasquez was "knocked unconscious," and that CW-9 "stopped the assault out of fear that those present in the garage would kill" him.[1] Among "those present" were Jose Rodriguez ("Stutter," New Bedford

---

[1] It is notable that, in contrast to the Latin Kings' obsession with judicial process and procedure in conflicts involving higher level members, such as Victim 9, Mr. Vasquez's termination

5

Inca and the brother of Jorge, sentenced to 54 months), and Michael Cotto ("Gordo," sentenced to 54 months).

> J. RODRIGUEZ ordered the termination of Jose VAZQUEZ (J. VAZQUEZ), aka FEARLESS, and FNU LNU, aka FLACA after it was discovered that VAZQUEZ and FLACA were sleeping together. Since both VAZQUEZ and FLACA are dating other ALKQN members, their actions are in violation of ALKQN law. J. RODRIGUEZ also order the violation of FNU LNU, aka RAMON, for assisting J. VAZQUEZ and FLACA in covering up their affair. Tanairy RUIZ, Xiomara VAZQUEZ, and Ines LUGO assaulted FLACA in her residence located at 104 Tallman Street, New Bedford. Several ALKQN members assaulted VAZQUEZ and RAMON in the garage of 104 Tallman Street. The Individual stopped the assault out of fear that those present in the garage would kill J. VAZQUEZ. J. RODRIGUEZ, Jose RODRIGUEZ (J.L. RODRIGUEZ), aka STUTTER, Blaze MIRANDA, FNU LNU, aka NAEL, and Michael COTTO, aka GORDO, were present in the garage at the time of the assaults. VAZQUEZ was knocked unconscious during the assault and went to the hospital for his injuries.

Excerpt from October 16, 2019 report documenting the violent termination of Mr. Vasquez from the Latin Kings.



Jorge Rodriguez, "G," in video captured by CW-9, stands over Mr. Vasquez during his violent termination from the Latin Kings, as he begins to regain consciousness..

---

appears to have been quite summary.



Jorge Rodriguez, "G," facing left, explaining to Mr. Vasquez the reason for his termination.



Mr. Vasquez stares dully at the cement floor of the garage, while G stands above him and continues to berate him. CW-9 can be heard suggesting he's had enough, and should be sent home to his "mom in Pennsylvania."

**3.    The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... issued by the Sentencing Commission …[3553(4)(A)]**

Probation's guideline range is heavily affected by Mr. Vasquez's nominal leadership role in the organization (3 levels) and his involvement (sometimes remote) in episodes of violence against Victim 9, who, as the government's evidence makes clear, was a target of violence based on the diktat of Jorge Rodriguez, or "King G," who has already been sentenced by the Court.

Mr. Vasquez has submitted objections to Probation, to which Probation has responded. PSR at 55-56. As the objections are set out in the PSR, they will not be repeated here.

One point will be addressed here. In its response, Probation justifies its scoring by asserting that the second attack against Victim 9 by Josue Carasquillo ("Playboy") (not yet sentenced) and Kevin Guadalupe ("Milly") (time served, two weeks) that occurred on or about June 19, 2019, must have been authorized by Mr. Vasquez, because he had approved a particular mission earlier in the day. PSR at 56. But Probation misapprehends the nature of Mr. Vasquez's role and authority as "enforcer"; Probation also overlooks evidence which suggests Mr. Vasquez did not know about the other attempt.

Mr. Vasquez did not have the authority to authorize that someone be killed. That type of authority was limited to higher level individuals such as Jorge Rodriguez ("G."). PSR ¶¶ 60-62. While not necessarily true of all enforcers, Mr. Vasquez did not feel he had the authority to approve a particular "mission" against a target without consulting with his superior (CW-9 in this instance). PSR at 55.

After the first shooting, in which Juan Figueroa ("Pun") (24 months) fired a shot, there was a debriefing session, which CW-9 recorded, in which two senior members, CW-9 himself and Jorge Rodriguez ("G,"), discussed the incident with the junior ones, Mr. Vasquez, the shooter Mr. Figueroa, and Shelton Johnson (Shells.")  PSR ¶¶ 64-69.  This recording clearly demonstrates the lines of authority and the seniority of the older members, and is notable for the absence of any reference to approval of any subsequent mission.  It is therefore far from frivolous to assert that the subsequent mission against Victim 9, carried out by Carraasquillo and which resulted in the injury to Victim 11, had not been authorized by Mr. Vasquez.  Indeed, he appears to have not had foreknowledge of it and there is no evidence he was consulted about it.  There was a standing order to attack Victim 9, and the government's evidence amply demonstrates that members were encouraged to act on their own, without resorting to seeking explicit authorization, in this type of circumstance.[2]

In addition to the factual objections, Mr. Vasquez suggests that his criminal history score may be somewhat overstated.  See USSG §4A1.3.  While Mr. Vasquez is firmly in Criminal History Category VI, with fourteen criminal history points, correctly assessed by Probation, the category may not reflect his true dangerousness.

Mr. Vasquez incurs 7 criminal history points for his criminal career prior to becoming a Latin King, which include his breaking and entering cases, and his drug trafficking and gun possession case, for which he received a two year sentence (3 points, 7 total).  PSR ¶134.  The other 7 criminal history points all stem from conduct in New Bedford which also could have

---

[2] For example, Stutter, Jose Rodriguez, the Inca of the New Bedford cell, is described by the government as directing members to target rivals "on sight," and to "stop calling me," "move on them," "just do it, that's it."  Gov't. Sent. Mem., ECF 2193, 10/21/21, at 3.

constituted racketeering acts, and so in an important sense are part of the offense to which he has pleaded guilty.

The federal intervention and sanction he now faces are without question different in kind than the punishments he received after those convictions in New Bedford District Court. Mr. Vasquez submits Criminal History Category IV is a better touchstone when assessing his incorrigibility and recidivism potential and the like, for which criminal history is considered to be a gauge. (An OL of 24 and CHC IV yields a sentencing range of 77 to 96 months).

**4.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct... [3553(a)(7)]**

Mr. Vasquez submits that his proposed sentence is consistent with other sentences the Court has already imposed in this case, and that to impose a guideline sentence under either calculation would create unwarranted disparity.

The proposed sentence is 2 years longer than the 54 months sentence imposed on Stutter (Jose L Rodriguez), the New Bedford Inca and G's (Jorge Rodriguez) brother. Stutter was one of those who administered the beating that ushered Mr. Vasquez out of the gang. Similarly, the proposed sentence is vastly longer than the sentences imposed on Milly (Kevin Guadalupe) (two weeks) and Pun (Juan Figueroa) (24 months), who took part in the attacks on Victim 9, and who, the evidence shows, were less removed from Mr. Vasquez in the hierarchy of the organization than might at first appear. The sentence is also two years longer than the 54 month sentence imposed by the Court on Shells (Shelton Johnson).

The sentence is the same as that imposed on Primo (Luis Mendez), 15 years Mr. Vasquez's senior, who had another federal case, intimidated the victims identified as Victims 2 and 3, was more highly placed, and was, we suggest, more culpable. The proposed sentence is consistent with the 84 month sentences imposed on Big A (Angel Roldan), and Bam (Angel Calderon), caciques or Incas, both of whom were more highly placed and more violent.

Finally, the sentence is lower than but consistent with the 96 months imposed on Sweepy, Jeremia Medina, who replaced Mr. Vasquez as enforcer of the New Bedford cell. As the Court will recall, Sweepy was charged with and convicted only of Count 2, which charged him with violations of 21 U.S.C. § 846. He was a career offender and pleaded guilty pursuant to a plea agreement providing for a binding range of 84 to 151 months.

But Sweepy was also more culpable than the younger Mr. Vasquez. According to the government, Mr. Medina was not caught up in the day-to-day drug sales in New Bedford for which the younger Mr. Vasquez was arrested multiple times because he was engaged in the trade at a much higher level. *See* "Gov't Sent. Mem.," ECF 1979, 6/16/21, at 2 (Mr. Medina "was a leader … the Defendant was not conducting street-level drug sales and would therefore not face investigation or arrest by local drug investigators … [h]e was manufacturing the cocaine base that was being pumped into the community by this organized group.") *In addition to this*, Mr. Medina was "personally responsible" for violence, two beatings, and coordinating violence against rival gang members.

## CONCLUSION

For the foregoing reasons, Mr. Vasquez requests the Court impose a sentence of **78 months**, to be followed by three years of supervised release, and the special conditions proposed

by Probation.

                                       JOSE VASQUEZ,
                                       By his attorney:

                                       */s/ Ian Gold*
                                       Ian Gold
                                       B.B.O. # 665948
                                       Law Office of Ian Gold
                                       185 Devonshire Street, Suite 302
                                       Boston, MA 02110

                                    CERTIFICATE OF SERVICE

      I, Ian Gold, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on Jul. 15, 2022.

                                         */s/ Ian Gold*